**Anne BRUNNER, Plaintiff,**

**v.**

**ABEX CORPORATION, Defendant.**

Civ. A. No. 85–3808.

United States District Court,
D. New Jersey,
Civil Division.

Nov. 26, 1986.

**1352**

Frank J. Fitzsimmons, Mary E. McTernan, Fitzsimmons & Ringle, P.C., Newark, N.J., for plaintiff.

Francis X. Dee, John K. Bennett, Carpenter, Bennett & Morrissey, Newark, N.J., for defendant.

## OPINION

BARRY, District Judge.

Plaintiff Anne Brunner filed this complaint on August 1, 1985 against her former employer, Abex Corporation, alleging that her termination from employment in November, 1983 breached an implied agreement of employment as well as an implied obligation of good faith and fair dealing. Plaintiff also included in her complaint allegations of negligence and violations of the public policy of New Jersey. A final pretrial order was entered on September 26, 1986. The case is now before this court on defendant's motion for summary judgment.

In a motion for summary judgment the court must view the facts in the light most favorable to the non-moving party and should only grant the motion if, after assuming all disputed facts in favor of the party opposing the motion, the moving party is entitled to judgment as a matter of law. *Bushman v. Halm*, 798 F.2d 651, 656, 657 (3d Cir.1986). Viewing the case in the light most favorable to plaintiff, the facts may be summarized as follows.

Plaintiff was hired by Abex as a Traffic Analyst commencing on October 9, 1981, and worked in the Transportation Department at Abex's offices in New York City. It is uncontroverted that plaintiff was "an excellent employee". May 29, 1984 Letter

from R.C. McArthur [plaintiff's immediate supervisor] to John Juliana attached at Tab 12 of September 19, 1986 Affidavit of John K. Bennett. From approximately 1973 to 1983 plaintiff lived in a rent-controlled apartment in Bronxville, New York. Deposition of Anne Brunner attached at Tab 4 of October 8, 1986 Affidavit of Mary E. McTernan. When plaintiff joined Abex she was given a company personnel manual. The first page of this manual consisted of a letter from Abex's president which in relevant part stated that "Abex's broad program of employee benefits which are outlined in this book will assist in providing security and protection for your family during your working years and beyond into retirement." Attached at Tab 16 to Bennett Aff.

On June 23, 1983, Abex announced that it was moving its Corporate Headquarters to Stamford, Connecticut and its Transportation Department to Mahwah, New Jersey. Pretrial Order, Stipulation of Facts at 2. Abex's employees, including plaintiff, were provided three options: (1) leaving Abex rather than following Abex to the new location, (2) maintaining their positions at Abex and commuting from New York, or (3) maintaining their positions at Abex and receiving relocation assistance to move closer to Abex's new offices. Pretrial Order, Stipulation of Facts at 2. On June 23, 1983 the President of Abex sent a letter to all New York office employees announcing the move. This letter stated in relevant part:

Personally, I view this move as a positive step for our company. At the same time, I appreciate the hardships it will create. We will do everything we can to minimize these adversities, including special assistance programs for employees who relocate and those who don't.

We want to fully understand the impact of this move on each of you. Tomorrow, you will meet with your Vice President and departmental managers in smaller, more open meetings. They will be as open and candid as possible, and I hope you will be, too.... Almost everyone faces some kind of change because of this, so we need to understand and help each other as much as possible.

We are announcing this move six months in advance to ensure we all have adequate time to plan this transition. I know I can count on you for the same cooperative spirit you have shown in other challenging situations. Together, we will make this transition as smooth and comfortable as possible.

June 23, 1983 Letter to all New York Office Employees attached at Tab 29 to McTernan Aff. Also on that same day Abex provided plaintiff with a memorandum entitled Summary of Employee Assistance Programs which stated at the outset that "while the details of some of these programs are yet to be worked out, Abex is committed to one thing—doing the best we can to help our employees through this transition." Tab 29 Attached to McTernan Aff.

Plaintiff elected to follow her job to Mahwah, New Jersey when her department was relocated on August 1, 1983. Pretrial Order, Stipulation of Facts at 3.[1] She decided to try commuting to Mahwah from her home in Bronxville and then, depending on how difficult she found the commute, to reach a final decision as to whether to relocate to New Jersey. Brunner Deposition at 78 attached at Tab 37 to McTernan Aff. On October 10, 1983 plaintiff informed her immediate supervisor, Robert McArthur, of her decision to move to New Jersey. She received $1,154.75 to cover the actual moving expenses and $2,500 for miscellaneous expenses associated with the move. Pretrial Order, Stipulation of Facts at 3. Plaintiff moved on November 14, 1983. She took four vacation days off from work to facilitate the move. Brunner Dep. at 117 attached at Tab 52 to McTernan Aff. On November 18, 1983 plaintiff called McArthur to request one additional day off and was informed that her job had been eliminated and that she was being terminated. Brunner Deposition at 119 attached at Tab 55 to McTernan Aff. During this telephone conversation, McArthur told

plaintiff that he had just heard the news. *Id.*

It appears from the record that this news was not completely "new" to McArthur. . In preparing the budget for his department prior to June 23, 1983 when Abex announced its decision to move, McArthur developed a budget with four or five different models some of which projected cutbacks in positions within the department to two including the elimination of plaintiff's position. McArthur Dep. at 76 attached at Tab 28 to McTernan Aff. McArthur explained in his deposition that he presented these various models in an effort to convince his superior, Arvind Paranjpe, that it would not be feasible to cut the department back from seven employees to two as Paranjpe was considering. McArthur Dep. at 78 attached at Tab 17 to November 10, 1986 Supplemental Affidavit of John K. Bennett. McArthur assumed that he had convinced Paranjpe to maintain a staff of five which included plaintiff's position because he did not hear anything further about the cutbacks from Paranjpe. *Id.* McArthur did not learn until November 17, 1983 that his department would in fact be cut back to two employees plus a shared secretary. McArthur Dep. at 45 attached at Tab 18 to Bennett Supplemental Aff. and Paranjpe Dep. at 44 attached at Tab 21 to Bennett Supplemental Aff.

During this same time period plaintiff claims that she was concerned about her job security and repeatedly asked McArthur if her job was in fact secure. Brunner Dep at 87, 89, 92, 93, & 99 attached at Tabs 39, 41–45 to McTernan Aff. McArthur recalls plaintiff asking him if there were lay offs coming which he understood to be the same as asking if her job was secure. McArthur Dep at 53 & 74 attached at Tabs 46 & 47 to McTernan Aff.

Subsequent to November 18, 1983, plaintiff sought new employment and continued to receive her salary until December 31, 1983. Additionally, she received three weeks severance pay and compensation for

---

**1.** In her brief opposing summary judgment at 19, plaintiff denies that she voluntarily decided to relocate to New Jersey. No factual support has been offered to support this allegation and, indeed, the record does not support it. During plaintiff's deposition she was asked in three different ways if it was her decision to move to New Jersey and each time she indicated that the decision to move was freely made by her. Brunner Dep. at 13 & 133, 134 attached at Tab 7 to Bennett Aff.

any unused vacation time accumulated in 1983. Abex paid the costs of employment counseling and agreed to reimburse plaintiff for any reasonable expenses associated with her job search. November 28, 1983 letter from Robert McArthur to Anne Brunner attached at Tab 10 to Bennett Aff. Moreover, McArthur wrote two sparkling letters of recommendation, one of which was sent directly to CBS Records which hired plaintiff in July, 1984 at a higher salary than she had earned at Abex. In August, 1984 Abex offered her a position as shipment control manager for a higher salary than she was receiving from CBS Records, but plaintiff refused the job.

The amended pretrial order clarifies that plaintiff claims that

(1) Abex breached an implied duty of good faith and fair dealing when it terminated plaintiff without cause and after repeated assurances that her job was secure;

(2) Abex violated the public policy of New Jersey by terminating plaintiff without cause in violation of the covenants of good faith and fair dealing;

(3) Abex was negligent towards plaintiff when it misled her about the security of her job causing plaintiff physical and emotional harm;

(4) Abex intentionally inflicted emotional distress on plaintiff by wrongfully discharging her; and

(5) Abex breached an implied contract between itself and plaintiff based on statements in the personnel handbook.

I turn first to plaintiff's allegations that her termination was in violation of an implied employment contract based on the Abex personnel manual and that her termination violated other implied covenants of good faith and fair dealing and was against the public policy of New Jersey (Claims 1, 2, and 5 above). Plaintiff argues that the Supreme Court of New Jersey in *Woolley v. Hoffman LaRoche, Inc.*, 99 N.J. 284, 491 A.2d 1257, *modified*, 101 N.J. 10, 499 A.2d 515 (1985), accepted the principle that good faith and fair dealing are required by both the employer and employee in at-will employment relationships.[2] Plaintiff also argues that the personnel manual provided plaintiff when she joined Abex establishes that she may only be dismissed with cause. Further, plaintiff claims that the two communications of June 23, 1983 constituted an unconditional offer of continued employment in Mahwah if plaintiff chose to remain with the corporation. Plaintiff attempts to buttress these arguments noting that she sought and received from her im-

---

**2.** Plaintiff has also pointed to cases from other jurisdictions in an apparent attempt to suggest that other courts which have reached the same conclusion as *Woolley* have implied covenants of good faith and fair dealing in all at-will employment contracts. These cases cited on page 21 of plaintiff's brief, however, do not lend much, if any, support to plaintiff's argument. For instance, in *Savage v. Holiday Inn Corp., Inc.*, 603 F.Supp. 311, 314 (D.Nev.1985), the district court relied on the fact that in Nevada "the implied covenant is intimately related to the public policy exception." As discussed elsewhere in this opinion, however, the public policy exception in New Jersey is extremely limited and cannot be said to relate to any implied covenant of good faith and fair dealing. *McKinney v. National Dairy Council*, 491 F.Supp. 1108 (D.Mass.1980), involved the allegations of a terminated employee that he was discharged because of his age. The court found that a termination of an at-will employee due to his age would violate the public policy of Massachusetts but specifically refrained from deciding whether there is a good faith requirement in every contract for employment at-will. 491 F.Supp. at 1118. Similarly, *Fortune v. National Cash Reg-

*ister Co.*, 364 N.E.2d 1251 (D.Mass.1977), also arising out of Massachusetts, was limited to its unusual facts involving a salesman who had a written contract detailing how commissions would be payable. He was transferred to another position shortly before he would have become entitled to approximately a $20,000 commission. Under these facts the Supreme Court of Massachusetts found that there was a jury issue regarding whether the defendant had acted in bad faith but again the Supreme Court of Massachusetts specifically declined to comment on whether an obligation of good faith existed in every contract. 373 Mass. 96, 364 N.E.2d 1251, at 1257. Finally, while in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980), the Michigan Supreme Court did indicate that all at-will employment relationships include an implied covenant of good faith and fair dealing, that opinion also held that oral assurances, if proven, would suffice to establish a contractual agreement. Inasmuch as *Toussaint* clearly granted at-will employees more protection than the Supreme Court of New Jersey has done, it is of minimal persuasive value to this court.

mediate supervisor oral assurances that her job was secure. Finally, relying on *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), plaintiff argues that her discharge, inasmuch as it was wrongful and abusive and deprived her of job security, was contrary to the public policy of New Jersey.

■ All of these arguments are spurious and must be rejected. At its core plaintiff's theory of her case relies on a faulty understanding of *Woolley*. That case, as stated by Chief Justice Wilentz in the second sentence of the opinion, holds only that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." 99 N.J. at 285, 286, 491 A.2d 1257. While there is broad language in *Woolley* emphasizing that job security is of grave importance, Chief Justice Wilentz also made clear that the Court's opinion in that case did not eliminate the power of an employer to retain the "absolute power to fire anyone with or without good cause." 99 N.J. at 309, 491 A.2d 1257.

My first inquiry must be to determine if, when fairly read, the personnel manual provided plaintiff could reasonably be interpreted by her to contain a promise of continued employment so long as her work performance was satisfactory. The personnel manual in this case was almost 100 pages long. Plaintiff has not identified any specific portion of that manual to support her claim other than the first page which consisted of a letter from the President of Abex and is quoted above.

Recognizing that the issue of when an employment manual may be said to contain implied promises of employment would be of paramount importance in future cases, the *Woolley* court set out a general summary of the personnel manual in a footnote. 99 N.J. at 287 n. 2, 491 A.2d 1257. The manual in *Woolley* included five pages of termination provisions including those relating to lay offs, discharge due to performance, disciplinary discharge, retirement, and resignation. There was no provision for discharge without cause and preceding this entire section was a statement entitled "Policy" which set forth that *"[I]t is the policy of Hoffman-LaRoche to retain to the extent consistent with company requirements, the services of all employees who perform their duties efficiently and effectively."* [3] *Id.* (emphasis added).

■ The personnel manual in this case contains detailed discussions of various insurance, profit sharing, and employee stock ownership plans. There is utterly no discussion, as in *Woolley*, of termination proceedings. Thus, plaintiff is concededly reduced to relying on one sentence in the manual that "Abex's broad program of employee benefits which are outlined in this book will assist in providing security and protection for your family during your working years and beyond into retirement." This sentence limits the benefits to which an employee is entitled to those outlined in the personnel manual. It does not provide any basis for implying additional rights or promises and, in fact, undercuts any such attempt. I, therefore, conclude that plaintiff does not have a claim for breach of an implied contract based on this employment manual.

Plaintiff's averment that the June 23, 1983 letters created a promise of continued employment presents an issue of first impression: may the holding of *Woolley*, which was limited to employment manuals,

---

3. I note in passing that the defendant in *Woolley* may very well have preserved its right to terminate an employee without cause if required because of a decline in business. It is hard to conceive that the Supreme Court of New Jersey intended to prevent a company from cutting its work force due to economic factors. The doctrine of commercial impracticability, for instance, allows for contract performance to be excused if the cost of the performance has in fact become so excessive and unreasonable that the failure to excuse performance would result in grave injustice. *See Gulf Oil Corporation v. Federal Power Commission*, 563 F.2d 588, 599 (3d Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). I need not reach this issue, however, because in the instant case as noted above the personnel manual does not contain any promise of continued employment.

be enlarged to encompass other written documents given the employee by the employer. I need not decide that issue, however, because assuming *arguendo* that those letters could create an implied promise, they include no promise, explicit or implicit, of continued employment. The two letters of June 23, 1983 do no more than commit Abex to assisting those employees who chose to follow their employment to new work locations with the process of relocation or adjustment to the new work site. No Abex employee who prior to June 23, 1983 understood that he or she was an employee at-will could reasonably assume after June 23, 1983 that his or her status had changed.

■ Moreover, reliance by plaintiff on any oral assurances of job security to support an allegation of an implied contract is simply not warranted by any reading of *Woolley*. *Woolley* was unmistakeably limited, even in its broadest interpretation, to commitments arising out of written communications by the employer to the employee. *Woolley* reaffirmed the conclusion of *Savarese v. Pyrene Manufacturing Co.*, 9 N.J. 595, 89 A.2d 237 (1952), that a long term employment commitment is only enforceable if there is clear and convincing proof of a precise agreement and the long term commitment is supported by consideration from the employee in addition to the employee's continued work. *Woolley*, 99 N.J. at 293, 491 A.2d 1257. The significance of *Woolley* is that it marked the first time that the Supreme Court of New Jersey concluded that a personnel manual could satisfy the first of these requirements.

■ Plaintiff's other claims regarding good faith and fair dealing and the public policy of New Jersey are quickly dismissed.

As noted above, *Woolley*, contrary to plaintiff's assertion, was not a revolution in the area of at-will employment. The relationship between an employer and employee absent any contract or implied contract premised on an employment manual after *Woolley* is no different than before. While the court acknowledged that *Woolley* may foreshadow change in the nature of at-will employment in New Jersey, at this time that change is no more than conjecture. If such a change is to come, it must be from the state courts. In the meantime, the Appellate Division of the Superior Court of New Jersey appears to have rejected the proposition that there is an implied covenant of good faith and fair dealing between an employer and an employee in an at-will situation.[4] In *McQuitty v. General Dynamics Corp.*, 204 N.J.Super. 514, 499 A.2d 526 (App.Div.1985), the plaintiff was fired after returning to work subsequent to an unsuccessful strike. As a result of the unsuccessful strike, plaintiff through his union had agreed to return to work without any contract pending negotiation of a new agreement, and was discharged prior to any new agreement being implemented. The court summarily rejected his implied good faith and fair dealing claim based on the expired contract because "one cannot read additional terms into a non-existent contract." While plaintiff argues that there is such an obligation despite the absence of a contract, *McQuitty* persuades me that that argument should be rejected.[5]

Turning to plaintiff's argument that her discharge was wrongful because it was contrary to the public policy of New Jersey, I note that *Pierce v. Ortho Pharmaceutical Corp.*, *supra*, 84 N.J. at 72, 417 A.2d 505, establishes that an at-will em-

---

**4.** Abex argues that New Jersey recognizes an implied covenant of good faith and fair dealing exclusively in the context of commercial contracts. Moving Brief at 14. While the cases relied on by Abex do establish that good faith and fair dealing are required in the commercial context, none of these cases explicitedly state that such an implied covenant is limited to cases in the commercial area. Given the holding of the Appellate Division in *McQuitty*, however, I need not dwell on this issue.

**5.** Plaintiff relies on *Magnan v. Anaconda Industries, Inc.*, 37 Conn.Supp. 38, 429 A.2d 492 (Conn.Super.1980), to argue that implied covenants of good faith and fair dealing exist in every contract case. While the holding of that case is more limited than plaintiff has suggested, in any event plaintiff has made no showing why this court should apply the rule of a lower court from outside New Jersey instead of the clear holding of a New Jersey lower state court.

ployee working without a contract may not be discharged for failing "to perform an act that would require a violation of a clear mandate of public policy." In *Pierce*, the Supreme Court of New Jersey expressed its concern for the professional who in an at-will employment setting was told to perform an act clearly violative of some statutory law, administrative rule, judicial decision, or code of professional conduct. Seeking to encourage professionals not to succomb to employment pressure, the Court determined that an employer may not discharge an at-will employee for acting pursuant to the clear mandate of public policy. Significantly, however, the Supreme Court emphasized that "unless an employee at-will identifies a specific expression of public policy, he may be discharged with or without cause." *Id.* Thus, *Pierce* should not be viewed as a back door for gaining more protection than otherwise available to an at-will employee.

■ In arguing that Abex terminated plaintiff contrary to the New Jersey public policy of encouraging job security, plaintiff has sought to enter this back door so firmly shut by *Pierce.* If this court were to adopt plaintiff's argument it would effectively mean that any termination of an at-will employee could be challenged thus contradicting the decision of the Supreme Court of New Jersey which allows employers the right to fire an employee for any reason or no reason. *See Woolley, supra,* 99 N.J. at 309, 491 A.2d 1257. Furthermore, in this case plaintiff was not fired for refusing to perform some task because of some sense of higher obligation. Plaintiff was terminated because Abex determined it needed to make cutbacks in the number of employees in plaintiff's department. That decision may have been unfortunate and its timing may have worked a hardship on plaintiff, but that decision is not the type which may be challenged under *Pierce.* In light of this discussion, defend-

ant is entitled to summary judgment on counts one, two, and five of the Pretrial Order.

Defendant also moves for summary judgment on plaintiff's negligence claim (count three) arguing that there is no cause of action in New Jersey for negligent discharge. This argument fails to address plaintiff's claim which is not that plaintiff was negligently discharged but that plaintiff was negligently misled about her job security causing her "physical and emotional harm and damage." Pretrial order at 29.[6]

The gravamen of a negligence claim is the breach of a legal duty owed by the defendant to the plaintiff where that breach is the proximate cause of the plaintiff's injuries. *Fortugno Realty Co. v. Schiavone-Bonomo Corp.,* 39 N.J. 382, 393, 189 A.2d 7 (1963); *McIntosh v. Milano,* 168 N.J.Super. 466, 480–481, 403 A.2d 500 (Law Div.1979); *See also Iafelice v. Luchs,* 206 N.J.Super. 103, 110, 501 A.2d 1040 (Law Div.1985) (*quoting Fortugno* as good law). It has often been said that whether a duty exists is ultimately a question of fairness involving consideration of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. Further, public policy considerations play a major role in the determination of whether a legal duty exists. *Luchs, supra,* 206 N.J.Super. at 110, 501 A.2d 1040 *citing Swidryk v. Saint Michael's Medical Center,* 201 N.J.Super. 601, 606, 493 A.2d 641 (Law Div.1985).

■ In the normal at-will employment relationship it is self-evident that an employer has only a minimal duty of care to his employees. As noted above, oral assurances regarding job security will not be sufficient to create an implied promise or contract. *See Savarese, supra.* It would be a mere technical distinction that would allow an at-will employee barred under contract law from asserting a breach of con-

---

**6.** It might be possible to read this claim as identical to plaintiff's claim of intentional infliction of emotional distress in light of the language in the Pretrial Order that defendant was negligent when it callously and *deliberately* misled plaintiff. It is axiomatic under New Jersey

law that one who is acting intentionally or deliberately cannot be acting negligently. *Price v. Phillips,* 90 N.J.Super. 480, 485, 218 A.2d 167 (App.Div.1966). Nevertheless, viewing this claim most favorably to plaintiff, I will assume that this claim sounds in negligence.

tractual duty to successfully plead that there was a breach of a tort duty of care. New Jersey law frowns on causes of action grounded in technical distinctions and rather looks to the underlying claim "to achieve substantial justice." *Swidryk, supra,* 201 N.J.Super. at 603, 493 A.2d 641. For instance, in *Swidryk* a doctor was sued in tort for negligently supervising the intern and resident program. The plaintiff also alleged that the doctor breached an implied contractual duty to provide the plaintiff suitable medical experience. The Law Division of the Superior Court summarily dismissed the contract claim finding it was consumed within the tort claim. *Id.*

The Supreme Court of New Jersey reached a similar result in *Spring Motors Distributors v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660 (1985), when it held that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods was limited to recovery under the Uniform Commercial Code and could not recover under either strict liability or negligence theories. In describing the demarcation of duties under tort and contract law the *Spring Motors* court explained that

> The purpose of a tort duty of care is to protect society's interest in freedom from harm, i.e., the duty arises from *policy considerations formed without reference to any agreement between the parties.* A contractual duty, by comparison, arises from society's interest in the performance of promises. Generally speaking, tort principles, such as negligence, are better suited for resolving claims *involving physical injury,* particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement. 98 N.J. at

579–580 [489 A.2d 660]. (emphasis supplied)

There is simply no basis for finding a tort duty of care relating to job assurances in the at-will employment relationship. To do so would contradict the whole premise of the at-will employement doctrine as explicated by the Supreme Court of New Jersey.[7]

■ Of course in this case, plaintiff points not only to oral assurances but also to the June 23, 1983 communications from Abex and argues that these communications evidence the voluntary assumption by Abex of a duty not to mislead employees about their job security. Assuming that these communications could create some additional duty that does not normally attach to the at-will employment relationship and that the breach of this duty could give rise to a tort cause of action, I still find that these two communications did not create a duty not to mislead employees about job security. These two communications do not once mention job security but only the type of aid Abex would provide its employees to adapt to their new work location. They neither establish a contract between the parties nor take their relationship outside of the at-will employement doctrine. To state the matter differently, after June 23 Abex may have been liable for inducing employees to remain by offering them benefits such as relocation funds which it did not have or did not intend to provide, but Abex retained the absolute right to fire an employee for whatever reason or for no reason. By offering to aid employees upon the relocation of its offices, Abex made no commitments, either explicit or implicit, that its employees had more job security. Accordingly, plaintiff's claim that Abex negligently misled her about her job security must fail.

---

7. The court has not ignored the language in *Pierce, supra,* 84 N.J. at 72, 417 A.2d 505, which holds that an employee terminated in clear violation of public policy may "maintain a cause of action in contract or tort or both." *Pierce* created in every employment relationship an "implied provision that an employer will not discharge an employee for refusing to perform an act that violates the clear mandate of public policy." *Id.* It followed therefore that an employer had a tort duty of care not to discharge an employee for failing to perform such an act. However, when the courts create certain prerequites for maintaining an action in contract and those prerequisites are not meant, *Pierce* does not apply.

Plaintiff's remaining claim that defendant's actions constitute intentional infliction of emotional harm is similarly without merit. While only one New Jersey court, *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981), has approved this cause of action, the United States Court of Appeals for the Third Circuit has found that it is reasonable to assume that the Supreme Court of New Jersey would similarly approve if it were to be called upon to do so. *Polito v. Continental Casualty Co.*, 689 F.2d 457, 464 (3d Cir.1982). Despite the paucity of cases within New Jersey on this subject, the Third Circuit, in reviewing cases arising out of Pennsylvania and the Virgin Islands, both of which like New Jersey follow § 46 of the Restatement, Torts 2d, has had occasion to explain the elements of this tort. Essential to a cause of action is that the intentional conduct be extreme and outrageous and cause severe emotional distress, "so severe that reasonable persons would not be expected to endure it." *Heywood v. Cruzan Motors, Inc.*, 792 F.2d 367, 372 (3d Cir.1986) (citation omitted) (applying Virgin Island law); *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271 (3d Cir.1985) (applying Pennsylvania law).

Defendant has directed the court's attention to *Cautilli v. GAF Corp.*, 531 F.Supp. 71, 74 (E.D.Pa.1982), which involved the claim of a disgruntled employee who alleged he was intentionally induced into committing himself to continued employment while the employer knew that the employee might be required to relocate his home. Comparing the potential harm in that case to the harm in cases in which courts found that a plaintiff had stated a claim, the Hon. Edward R. Becker, then a district court judge, found that the harm before him

pales before the extreme outrage of withholding a dead child's body from its parents [*see Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970) ], a sur-

geon's knowingly misrepresenting the severity of a child's medical condition to its parents [*see Hume, supra* ], or a physician's knowingly supplying newspaper reporters with false information that a football player was suffering from a grave, possibly fatal, illness [*see Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254 (E.D.Pa.1977), *aff'd en banc*, 595 F.2d 1265 (3d Cir.1979) ]. *Id.*

■ In response, plaintiff points to two cases from states other than New Jersey [8] and makes no attempt to deal with the most persuasive *Cautilli* case. Defendant' actions in this case simply do not rise to the level found necessary in *Cautilli* to state a cause of action. Abex made every effort both to blunt the effects of its decision to terminate plaintiff's position and to aid plaintiff in securing a new job.

In summary, the court finds that defendant has demonstrated that as to each of plaintiff's claims defendant is entitled to judgment as a matter of law. Accordingly, the court will enter an order granting defendant's motion and dismissing the action.

## ORDER

This matter having been brought to the Court on the motion of defendant, Abex Corporation, for the entry of summary judgment on all of plaintiff's claims in this action, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the Court having fully reviewed and considered the pleadings, the parties' supporting and answering briefs and affidavits, the discovery materials submitted to the Court, and the Pretrial Order entered in this action, and having heard oral argument on this motion, and good cause appearing therefor, it is, on this 26th day of November, 1986, hereby ORDERED as follows:

Summary judgment is hereby entered in defendant's favor as to all of plaintiff's claims in this action as a matter of law, and

---

8. These two cases, *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980), and *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315 (1978), are the Arkansas and Massachusetts equivalents of *Hume* in that in *Agis* and *Counce*

the Supreme Courts of those respective states acknowleged the existence in their respective jurisdictions of a cause of action for the intentional infliction of emotional distress.

plaintiff's Complaint is hereby dismissed with prejudice in its entirety.